UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

STACEY SKOLE,

                             Plaintiff,                     Civ. No.

        - against -                   <u>COMPLAINT</u>

ACCENTURE LLP,                   PLAINTIFF DEMANDS
                                              <u>A TRIAL BY JURY</u>

                             Defendant.
----------------------------------------------------------------x

       Plaintiff Stacey Skole ("Skole" or "plaintiff"), through her attorneys Vladeck, Raskin & Clark, P.C., complains of defendant Accenture LLP ("Accenture," "the Company," or "defendant") as follows:

<u>NATURE OF ACTION</u>

       1.     Skole is an experienced and sought-after expert in the field of retail merchandising. She is 51 years old.

       2.     For almost nine years, Skole worked for Accenture, rising through the ranks to become, most recently, a Senior Manager, a role to which she was promoted in 2016. Skole was consistently a top performer at Accenture and her clients and managers routinely praised her for her work. Prior to Skole's firing in November 2019, Accenture management had never given her a negative review.

       3.     Consistent with Skole's record, Skole understood that she was on track to become a Managing Director ("MD"), a top-level management position.

       4.     In or around May 2019, Skole began working with Scott Uelner ("Uelner"), an MD, on a project for a Fortune 500 company. Throughout the time Skole worked with Uelner, he verbally abused her and treated her differently from the men on the team.

5.      According to Accenture's Code of Business Ethics ("the Code"), employees were required to escalate concerns about disrespectful, inappropriate, or illegal behavior. The Code made clear that employees would not be retaliated against for doing so.

6.      In violation of its promises in the Code, when Skole summoned the courage to stand up to Uelner in late summer and early fall 2019, the Company swiftly and severely retaliated against her.

7.      On October 1, 2019, four days after Skole complained about Uelner to Accenture Employee Relations, Uelner belatedly provided Skole with her performance review for the Fortune 500 company project. Unlike Skole's other reviews for that year and years prior, Uelner's review was mostly critical of her work.

8.      Shortly afterward, on November 1, 2019, Skole received an unjustified rating of "Not Progressing" for fiscal year ("FY") 2019.  Before the November 2019 review, Skole had never  received a negative review nor any indication that she was not progressing in her role.

9.      On November 6, 2019, Accenture fired Skole.

10.      In addition to taking action against Skole because she was a woman who stood up for herself, Accenture's unlawful termination of Skole's employment was part of its larger pattern of systematically replacing older workers with younger ones. The Company routinely forces managers in their fifties and older out of the Company and openly boasts about its focus on hiring mostly younger workers. One senior employee once confided in Skole that he planned to retire around the age of 50 because "old guys shouldn't be hanging around" and that older employees are "supposed to leave to make room for the next generation." Around the same time Accenture fired Skole, it also fired six other people in her position; five of the six people were over 40.

11.     Skole brings this action to remedy discrimination and retaliation in violation of Title VII of the Civil Rights Act as amended, 42 U. S.C. § 2000e et seq. ("Title VII"); and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA").

12.     In addition, Skole brings this action to remedy discrimination and retaliation in violation of the New York State Human Rights Law ("State Law"), N.Y. Exec. Law § 296 et seq., and the New York City Human Rights Law ("City Law"), New York City Administrative Code, § 8–101 et seq.

13.     Skole further asserts a claim for breach of contract under New York common law.

14.     Skole seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to Title VII, the ADEA, State Law, City Law and the New York common law.

<u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction over plaintiff's Title VII and ADEA claims pursuant to 28 U.S.C. § 1331; 29 U.S.C. § 626(c) of the ADEA; and 42 U.S.C.A. § 2000e-5(f)(3) of Title VII.

16.     Jurisdiction is proper over each of plaintiff's claims pursuant to 28 U.S.C. § 1332 because Skole is a citizen of New York State and Accenture is headquartered in Dublin, Ireland and because the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over plaintiff's claims under the State City Laws and under New York common law pursuant to 28 U.S.C. § 1367 because these claims closely relate to her Title VII and ADEA claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because plaintiff worked in Accenture's New York City office and a substantial part of the events or omissions giving rise to the claims occurred in New York City.

18.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, Skole will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

19.     On June 23, 2020, Skole filed a charge against Accenture alleging unlawful sex discrimination, age discrimination, and retaliation with the United States Equal Opportunity Employment Commission (the "EEOC"). On January 15, 2021, at plaintiff's request, the EEOC issued plaintiff a notice informing her of the right to sue under Title VII and the ADEA.

<u>PARTIES</u>

20.     Skole is a resident of the State of New York. She worked at Accenture for almost nine years in total before the Company unlawfully terminated her employment in November 2019.

21.     Accenture is a global professional services firm headquartered in Dublin, Ireland.  Its main New York City office is located at 1350 Avenue of the Americas.

<u>FACTUAL ALLEGATIONS</u>

<u>Skole's Success at Accenture</u>

22.     Skole was a top performer and recognized leader at Accenture. Her managers, peers, and clients routinely praised her work.

23.     Skole is a 51 year-old woman. She was born in March 1969.

24.     Accenture first hired Skole in January 2005. She left the Company in January 2009 as part of a voluntary downsizing tied to the 2008 financial crisis. In February 2015, Accenture rehired Skole.

25.     Skole's most recent title was Products Management Consulting Senior Manager, Client & Market, Supply Chain practice. Accenture promoted her to that role in December 2016, approximately two years after it rehired her in February 2015.

26.     Skole specialized in retail merchandising, a field in which she had worked for decades, including when she worked for Accenture from 2005 to 2009. Skole's clients included several Fortune 500 companies.

27.     Until Accenture fired Skole in November 2019, she had understood that she was on track to become an MD, a top-level management position. On July 29, 2019, around the end of Accenture's 2019 fiscal year, Bradley Pawlowski ("Pawlowski"), the leader of the Northeast Supply Chain practice and Skole's Career Counselor[1], communicated to Skole that one of her Actions[2] for FY 2020 was to "Determine [her] Career Path Forward to MD."

28.     During the almost nine years that Skole worked for Accenture, she was uniformly praised for her work. FY 2019 was no different. Skole received all "Great work" ratings, including the following feedback from Accenture leadership:

    a.  "Stacey was able to make immediate impact, in a short time frame, given little/no notice."

---

[1] According to Accenture, the Career Counselor is supposed to be a coach, champion, and connector. They are responsible for empowering their counselees to innovate and be their best selves, personally and professionally.

[2] An Action is a specific, personalized step a Career Counselor assigns to their counselee to grow the counselee's career and Accenture's business.

b.  "In all cases, your impact has been tremendous. . . . From direct observation and feedback I gathered from others, you have a great range of skills and strengths . . ."

c.  "She's the best of the best . . ."

d.  "You were able to show that you know how to run a project and the whole C-level were impressed about that."

e.  "Stacey did a fantastic job . . ."

f.  "Stacey has made a tremendous impact on [the project] and has been the glue holding the team together over the last few months.  Her work . . . has been invaluable."

29.   Skole received similarly impressive feedback from her clients. For example, the Chief Information Officer of one of Skole's clients told Skole that the only reason the client purchased work from Accenture was that its senior leadership liked Skole and wanted to work with her.

30.   In FY 2019, the last full year Skole worked for Accenture, Skole also met her productivity target, which is calculated as the percentage of time booked to chargeable client work and business development.

<u>Accenture's Code of Business Ethics</u>

31.   Accenture maintains an extensive Code that outlines "expected behaviors" of its employees to ensure that Accenture "always act[s] with integrity and [] in compliance with the law." Accenture requires that all employees complete yearly training on the Code.

32.   The Code is organized under six "fundamental behaviors" that purport to apply to every Accenture employee.

33.     The first "fundamental behavior" in Accenture's Code requires employees to "speak up" if the employee witnesses "disrespectful, inappropriate [or] illegal behavior."

34.     Under the Code, "disrespectful behavior" is not tolerated. The Code lists as examples of disrespectful behavior: "shouting"; "rudeness"; "uncontrollable and threatening anger"; "abuse of authority"; "deliberate exclusion . . . from work social activities"; and "[t]hreats of dismissal, loss of promotion, [or] depriving someone of work opportunities or other negative consequences, which are not consistent with [the Company's] principle of meritocracy."

35.     Accenture's Code guarantees that employees who comply with their obligation to raise concerns about such behaviors can do so "without fear of retaliation." The Code describes Accenture's anti-retaliation policy as "zero tolerance."

<u>Gender Discrimination</u>

36.     Skole first began working with Scott Uelner ("Uelner"), an MD, in May 2019 on an assignment for a Fortune 500 company. In June 2019, Uelner asked Skole to assume the role of Project Management Office ("PMO") Lead, a leadership role on the project. Uelner told Skole that representatives of the Fortune 500 company "loved [Skole] and wanted [Skole] in the role." Skole told Uelner that she was happy to do whatever was necessary to help the project.

37.     In that role, Skole replaced the project's original PMO Lead, who is male. Accenture removed the previous lead from the role after less than two weeks upon the client's demand, as representatives of the Fortune 500 company purportedly found the original PMO Lead offensive and did not like working with him. However, Uelner promised the previous PMO Lead that he could continue to work on the project in a different capacity.

38.     After agreeing to take over as PMO Lead, Skole asked Uelner and Alison O'Neill ("O'Neill"), an MD and Skole's direct manager, to define the roles and responsibilities for

the project given that the previous PMO Lead would be staying on. O'Neill told Skole that the previous PMO Lead would work "in the background" to set up the PMO infrastructure while Skole would manage the project's day-to-day operations.

39.     Skole was never able to assume the full scope of responsibilities she had been assigned because the previous PMO Lead continued to insert himself into the day-to-day operations.

40.     Throughout Skole's time working with Uelner, Uelner verbally abused Skole and treated her differently from the men on the team.

41.     For example, on or about July 10, 2019, Skole met with Uelner and two MDs on the project, Ndidi Oteh ("Oteh") and Kara Kelly ("Kelly"). As soon as Skole started speaking, Uelner's face turned red and he became annoyed and angry. Kelly, recognizing Uelner's hostility and that it upset Skole, encouraged Skole to continue speaking.

42.     Skole complained to O'Neill about Uelner's mistreatment. Skole asked O'Neill if, given Uelner's conduct toward her, Uelner did not like Skole. O'Neill confided in Skole that Uelner had also harassed O'Neill.

43.     Skole also complained to Ritchie Hamm ("Hamm"), an MD who witnessed Uelner's abusive and upsetting conduct toward Skole during a late-night working session on July 24, 2019. Hamm told Skole he would "take care of it." On information and belief, Hamm told Uelner that Skole had complained about him.

44.     After Skole complained about Uelner's abusive treatment, the harassment escalated.

45.     On August 8, 2019, Skole met with Uelner and another manager. During the meeting, Uelner asked Skole what work Skole had been doing – a question he had asked Skole

repeatedly over the previous few weeks despite Skole having answered it each time. Skole replied that she had been asking for clarification on her role since June. Uelner looked at Skole, smirked, and said, "Stacey, you're done."

46.     Skole told Uelner that the way he spoke to her was disrespectful and humiliating and that she was not going to tolerate it anymore. Skole left the meeting.

47.     Skole is not aware of Uelner being abusive toward men on the team.

48.     Soon after the meeting, Hamm pulled Skole aside and asked how she was. Skole told Hamm that Uelner had fired her. Hamm replied, "[Uelner] can't fire you." Skole said, "He told me I was 'done.'"  Hamm reiterated that Uelner could not fire Skole and instructed Skole no longer to interact with Uelner. Hamm also told Skole that she would report directly to Hamm going forward.

49.     During the next two weeks, Skole was off from work due to a previously scheduled vacation.

50.     On August 23, 2019, Skole's last day of vacation, Uelner sent Skole an email stating that she was no longer the PMO Lead. Uelner said that Skole should connect with Hamm about getting involved with another part of the project.

51.     While Skole was on vacation, Uelner had replaced her as PMO Lead with a man.

52.     When Skole returned to work in late August 2019, she spoke with Hamm and O'Neill about opportunities on the project. From late August to late September 2019, Hamm and O'Neill repeatedly told Skole that they were working to find Skole a role on the team. During this time, Skole was largely ignored but assisted wherever she could.

<u>Accenture Strips Skole of Her Responsibilities</u>

53.     Despite Skole's success on the project with the Fortune 500 company, Accenture removed her altogether from the project the week of September 23, 2019.

54.     No one from Accenture leadership told Skole they had removed her from the project. Skole only learned that she was no longer on the project when her security badge for the client's offices did not work on September 24, 2019. An Executive Assistant at the client's offices told Skole that Skole was "not on the list" to have her badge reactivated. She suggested that Skole speak to the man who had replaced Skole as PMO Lead.

55.     Skole immediately spoke with the man who had replaced her as PMO Lead. He told Skole that she had a "roll off" date of September 30, 2019 for the project. This meant that Skole would no longer be working on the project after that date.

56.     On September 25, 2019, the Senior Managers and MDs on the project met for a business dinner. Skole was not invited.

57.     On September 27, 2019, O'Neill, Skole's direct manager, clarified to Skole that Skole's last day working on the project would be October 4, 2019.

58.     Skole later learned that when representatives of the Fortune 500 company learned that Accenture had taken her off the project, they requested that Accenture assign Skole to one of their other projects, stating that she was a "very strong resource." Accenture did not honor that request.

<u>Skole Complains About Uelner and He Continues to Retaliate Against Her</u>

59.     On September 27, 2019, Skole spoke with Traci Melody ("Melody"), an Accenture Employee Relations representative. As required by the Code's "Speaking Up and Zero

Tolerance for Retaliation" policy, Skole told Melody that Uelner had mistreated Skole and retaliated against her for standing up for herself.

60.     On October 1, 2019, four days after Skole complained about Uelner to Accenture Employee Relations, Uelner belatedly provided Skole with her performance review for the Fortune 500 company project. Accenture's deadline for managers to submit evaluations for FY 2019 projects had passed in late July. Although Skole had repeatedly asked Uelner for this feedback beginning in June, he refused to complete it on time.

61.     Unlike the other reviews Skole had received from other managers that year and in years prior, Uelner's review was mostly critical of Skole.

62.     This feedback directly contradicted the review Skole received from her direct supervisor, O'Neill. O'Neill described Skole's work as "great," "invaluable," and "tremendous," and stated that Skole had been "the glue holding the team together." Similarly, Oteh, another MD on the project with the Fortune 500 company, described Skole in glowing terms. Oteh wrote to Skole in an email on July 19, 2019: "We also want to say thank you for being an exemplary team player and people developer. Your commitment and willingness to shift and adjust to make sure we do our best to show [the client] the benefits of partnering with Accenture has been key to our continued progress."

63.     As detailed above, Skole received similarly strong reviews from other members of Accenture leadership with whom she had worked throughout FY 2019.

64.     Upon information and belief, given the timing of Uelner's review, the other "great" reviews Skole received, and Uelner's proclivity to target women, Uelner gave Skole a negative review because she is a woman who stood up to him and his abusive conduct.

11

Age Bias at Accenture

65.    In addition to allowing its management to mistreat women, Accenture has a pervasive culture of ageism.

66.    Accenture routinely forces Senior Executives and MDs who are in their fifties to leave the Company while prioritizing the hiring and retention of younger employees.

67.    In 2015, Accenture hired 90,000 "millennials"—representing 90% of their global hires for that year.[3]

68.    Accenture openly flaunts its age bias. In fact, three high-level Accenture executives recently bragged in their book that "[f]ortunately, Accenture is blessed to have more than 75 percent of its employees from the millennial generation, a cohort with a hunger to learn and to improve its own employability."[4]

69.    As Accenture has expanded its hiring of millennials, it has also systematically replaced older employees, particularly those over 50.

70.    For example, in September 2019, Accenture replaced one of its older Executives, who was then 54, with a much younger man who was then 40.

71.    The Company's preference for younger employees was apparent in Products Management Consulting Client & Market, of which Skole was a part. For example, in

---

[3] Claire Zillman, "Accenture Hired 90,000 Millennials Last Year," Fortune, March 4, 2016, https://fortune.com/2016/03/04/accenture-hiring-spree-millennials/ (accessed March 1, 2021).

[4] Omar Abbosh, Paul Nunes, and Larry Downes, Pivot to the Future: Discovering Value and Creating Growth in a Disrupted World (New York: Public Affairs, 2019), 116; see also, "Accenture Execs Explain Why a Company's True Investment Isn't in AI—It's in Retraining Its Current Workforce," Business Insider, April 22, 2019, https://www.businessinsider.com/intelligent-technologies-require-new-work-skills-not-new-workers-2019-4 (accessed March 1, 2021).

2018, the average age of the 11 Senior Managers who the group promoted to MD was approximately 37.

72.     The Company's ethos that younger is better is widespread. For example, on January 31, 2019, Mohammed Hajibashi ("Hajibashi"), the National Supply Chain Lead who was 47 at the time, told Skole that he planned to retire around the age of 50. He stated that "old guys shouldn't be hanging around" because they are "supposed to leave to make room for the next generation." At that time, Hajibashi was discussing an Accenture employee who was only 55. He also told Skole that Accenture offered these older senior executives generous packages to entice them to leave the Company.

<u>Accenture Lays the Groundwork to Fire Skole</u>

73.     On October 25, 2019, Melody told Skole that Accenture had internally investigated Uelner's conduct and concluded that Uelner had not retaliated against Skole. Melody admitted that there was poor communication on the project. Melody then stated that Pawlowski, Skole's Career Counselor, would follow up with Skole.

74.      Skole met with Pawlowski on November 1, 2019. He told Skole that Accenture rated her as "Not Progressing" for the FY 2019 performance year. Among other things, the "Not Progressing" rating made Skole ineligible to receive a raise and annual bonus, stripping Skole of money she had earned and deserved.

75.     Pawlowski also told Skole that Accenture was terminating her position in Client & Market effective immediately. In addition, Accenture was prohibiting Skole from starting a role with a client that was supposed to begin the next business day. Skole was selected for the new role by an MD who said that Skole had come so highly recommended that he had no need to

interview her. Pawlowski told Skole that if she did not find a role in a different Accenture group within two weeks, Accenture would terminate her employment.

76.     The foundation of Accenture's performance review process is providing ongoing feedback throughout the year.  Accordingly, a "Not Progressing" review should never be a surprise, as Accenture's practice was to communicate any issues to an employee long before her annual review. This unjustified review shocked Skole.

77.     Contrary to Pawlowski's assurances, Accenture did not give Skole two weeks to find a new role.  Instead, on November 6, 2019 – only two business days after Skole's conversation with Pawlowski – an Accenture Human Resources representative contacted Skole to discuss Skole's separation from the Company. The next day, November 7, 2019, the representative sent Skole an email attaching a separation agreement.

78.     On November 8, 2019, Skole spoke with Hajibashi, the National Supply Chain Lead who had previously commented that "old guys" should not be "hanging around" at the Company. Hajibashi and Skole discussed Skole's FY 2019 review and the "Not Progressing" rating.

79.     Hajibashi told Skole that she received the "Not Progressing" rating due to deficiencies in three areas: time at level, productivity, and meeting expectations of becoming an MD.  Skole subsequently provided facts to disprove each of Hajibahi's claims. Hajibashi was unable to respond to Skole's challenges.

80.     First, Hajibashi claimed that Skole had spent too much time at the Senior Manager level. This was false. Skole was three years into a three-to-five year role.  64 of the 143 (45%) Products Management Consulting Senior Managers had been in the position for the same

amount of time as Skole had been or longer. 15 of those 64 (23%) were over the five-year limit, with times at the Senior Manager level ranging from 61 to 86 months.

81.    Second, Hajibashi told Skole that she had failed to meet expectations for productivity. As explained above, this was also false. Skole's productivity in FY 2019 was 77.4%, which met the Company-set target.

82.    Third, Hajibashi claimed that Skole had failed to meet expectations of becoming an MD. Within this category, he identified five areas of alleged deficiency: skillset, career progression, relationship building, executive presence, and dealing with ambiguity.

83.    This allegation was also false, as demonstrated by feedback written by members of Accenture's own leadership team in FY 2019, including Pawlowski. For example:

      a.  Skillset: Michael Brown, an MD with whom Skole had worked, wrote: "From direct observation and feedback I gathered from others, you have a great range of skills and strengths including your industry knowledge, content area knowledge (e.g., supply chain), as well as your broad consulting tools/skills (e.g., project management, leadership, analytical horsepower, organized and structured thinking). You are a very relevant consulting practitioner to/for our clients and the types of consulting work we want to do with your clients."

      b.  Career Progression: Pawlowski assigned Skole the following Action for FY 2020: "Determine Career Path Forward to MD: Explore I&TL [Innovation & Thought Leadership] and MD career path options and plan development accordingly based on career path

expectations." He also wrote that Skole had "shown strong organizational and delivery skills and needs to determine which area to focus on to do this. . . ."

c.  Relationship Building: O'Neill wrote: "Stacey is very empathetic and can put herself in the client's position, helping her to better understand how we can best work with [the client]." Oteh wrote: "We also want to say thank you for being an exemplary team player and people developer. Your commitment and willingness to shift and adjust to make sure we do our best to show [the client] the benefits of partnering with Accenture has been key to our continued progress." Pawlowski wrote: "Stacey's 'people first' approach is her mindset and truly guides what she does." Pawlowski also marked Skole's Action for relationship building as "Completed." Additionally, Skole was one of a select few employees who Accenture recognized as a "Rock Star Career Counselor," a designation given to Career Counselors who "mak[e] a difference in [employees'] everyday experience as a coach, a champion, a connector, and a fantastic model of our Conduct Counts behaviors."

d.  Executive Presence: Olli-Pekka Lumijarvi, another MD with whom Skole had worked wrote: "You were able to show that you know how to run a project and the whole C-level were impressed about that." Pawlowski gave Skole a "Great work" rating on her executive

16

presence Priority[5]. Pawlowski also marked Skole's Action for executive presence "Completed."

e.  Dealing with Ambiguity: Skole had identified this area in her own self-feedback for a poorly organized project that had no clearly defined deliverables or roles and responsibilities.  In response, the MD of the project, Sudhir Holla, wrote that Skole had, in fact, made significant progress on dealing with ambiguity throughout this challenging project.

84.    Furthermore, the only new Action that Pawlowski assigned to Skole for FY 2019 was Business Development ("BD"). In FY 2019, Skole worked on six BD efforts. Skole successfully sold the only BD effort she was given the opportunity to lead, a $2.2 million deal.

85.    Finally, Pawlowski and Hajibashi directed Skole to take every role she had in FY 2019. Skole received an overall rating of "Great work" for each of those roles.

86.    Skole told Hajibashi that she had been blindsided by the "Not Progressing" rating as no one had ever told her there were any issues with her performance. Pawlowski documented nothing to justify giving Skole this rating – the section of Skole's review that required Pawlowski to provide feedback was left blank.

87.    Hajibashi agreed with Skole that a "Not Progressing" rating should never be a surprise. He said that he would follow up with Pawlowski. Skole never heard back from either of them.

---

[5] A Priority is an area of focus where the greatest impact can be made for the best performance. They are created by individuals for themselves.

<u>Termination</u>

88.     Skole's last day of work at Accenture was November 15, 2019. Upon information and belief, Accenture terminated Skole's employment because of her gender and age and because of her opposition to unlawful treatment.

89.     First, Accenture's justification for the "Not Progressing" rating was pretextual. As detailed above, the assertion that Skole had failed to meet expectations for time at level, productivity, and becoming an MD was demonstrably false. Skole received all "Great work" ratings in FY 2019. The only negative feedback Skole received was the retaliatory review from Uelner.

90.     Second, contrary to its practice with younger employees, Accenture fired Skole rather than giving her a chance to improve her purported shortcomings. For example, two of Skole's counselees, both of whom were 29 at the time, received "Not Progressing" ratings before Skole became their Career Counselor. However, unlike Skole, both had received feedback that justified the ratings. Also unlike Skole, Accenture put these employees on Performance Improvement Plans and gave them a chance to improve rather than immediately fire them.

91.     Moreover, according to Accenture's own data, five of the six people in Skole's position who Accenture fired at the same time as Skole were over 40, even though approximately 60% of those in that position were under 40. The sixth person whose employment Accenture terminated was 39.

<u>FIRST CAUSE OF ACTION</u>
Title VII: Gender Discrimination

92.     Plaintiff repeats and realleges paragraphs 1 through 91 as if fully set forth herein.

93.    By the acts and practices described above, Accenture discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

94.    Accenture engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

95.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of Accenture's discriminatory practices unless and until this Court grants relief.

<u>SECOND CAUSE OF ACTION</u>
ADEA: Age Discrimination

96.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

97.    By the acts and practices described above, Accenture discriminated against plaintiff in the terms and conditions of her employment on the basis of her age in violation of the ADEA.

98.    Accenture knew that its actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.  These violations were willful within the meaning of the ADEA.

99.    Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of Accenture's discriminatory practices unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
Title VII: Retaliation

100.    Plaintiff repeats and realleges paragraphs 1 through 99 as if fully set forth herein.

101.    By the acts and practices described above, Accenture retaliated against plaintiff for her opposition to unlawful discrimination in violation of Title VII.

102.    Accenture acted with malice and/or reckless indifference to plaintiff's rights protected under federal law.

103.    As a result of Accenture's retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

<u>FOURTH CAUSE OF ACTION</u>
ADEA: Retaliation

104.    Plaintiff repeats and realleges paragraphs 1 through 103 as if fully set forth herein.

105.    By the acts and practices described above, Accenture retaliated against plaintiff for her opposition to unlawful discrimination in violation of the ADEA.

106.    Accenture acted with malice and/or reckless indifference to plaintiff's rights protected under federal law. These violations were willful within the meaning of the ADEA.

107.    Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of Accenture's discriminatory practices unless and until this Court grants relief.

FIFTH CAUSE OF ACTION
State Law: Gender and Age Discrimination

108.    Plaintiff repeats and realleges paragraphs 1 through 107 as if fully set forth herein.

109.    By the acts and practices described above, Accenture, in violation of the State Law, discriminated against plaintiff on the basis of her sex and age.

110.    Accenture acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

111.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

SIXTH CAUSE OF ACTION
State Law: Retaliation

112.    Plaintiff repeats and realleges paragraphs 1 through 111 as if fully set forth herein.

113.    By the acts and practices described above, defendant, in violation of the State Law, retaliated against plaintiff because of her opposition to defendant's unlawful conduct.

114.    Accenture acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

115.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## SEVENTH CAUSE OF ACTION
### City Law: Gender and Age Discrimination

116.    Plaintiff repeats and realleges paragraphs 1 through 115 as if fully set forth herein.

117.    Before Accenture fired Skole, she worked for Accenture at the Company's New York City office.

118.    By the acts and practices described above, defendant, in violation of the City Law, discriminated against plaintiff on the basis of her sex and age.

119.    Defendant engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

120.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## EIGHTH CAUSE OF ACTION
### City Law: Retaliation

121.    Plaintiff repeats and realleges paragraphs 1 through 120 as if fully set forth herein.

122.    Before Accenture fired Skole, she worked for Accenture at the Company's New York City office.

123.    By the acts and practices described above, defendant, in violation of the City Law, retaliated against plaintiff because of her opposition to defendant's unlawful conduct.

124.    Defendant engaged in retaliation with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

125.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## NINTH CAUSE OF ACTION
Breach of Contract

126.    Plaintiff repeats and realleges paragraphs 1 through 125 as if fully set forth herein.

127.    By the acts described above, including terminating Skole's employment because she raised concerns about improper conduct, defendant breached the promises it made in the Code.

128.    As a result of defendant's acts, plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a)    declaring the acts and practices complained of herein to be violations of Title VII, the ADEA, the State Law, the City Law, and the New York common law;

(b)    enjoining and permanently restraining these violations of Title VII, the ADEA, and the State Law, the City Law, and the New York common law;

(c)    directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendant to place plaintiff in the position she would have occupied but for defendant's unlawful treatment of her, and making her whole for all earnings and other benefits she would have received but for defendant's discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e)     directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(f)     directing defendant to pay liquidated damages for its violation of the ADEA;

(g)     directing defendant to pay plaintiff additional amounts as punitive damages;

(h)     awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i)     awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

(j)     awarding such other and further relief as this Court deems necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:  New York, New York
        March 1, 2021


                                        VLADECK, RASKIN & CLARK, P.C.


                                By:     _____/s_____
                                        Anne L. Clark
                                        Emily Miller
                                        Attorneys for Plaintiff
                                        565 Fifth Avenue, 9th Floor
                                        New York, New York 10017
                                        (212) 403-7300